IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL O'HANLON, an individual, JONATHAN ROBISON, an individual, GAYLE LEWANDOWSKI, an individual, IRMA ALLEN, an individual, on behalf of themselves and all others similarly situated, and PITTSBURGHERS FOR PUBLIC TRANSIT, a project of THOMAS MERTON CENTER, INC., a Pennsylvania non-profit corporation, on behalf of themselves and all Individuals similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., RASIER, LLC, and RASIER-CA, LLC,<br><br>Defendants. | Civil Action No. 2:19-cv-00675<br><br>Magistrate Judge Lisa Pupo Lenihan<br><br>ECF No. 45 |

**MEMORANDUM OPINION ON DEFENDANTS' MOTION TO DISMISS**

**I.      SUMMATION**

For the reasons set forth below, the December 19, 2019 Motion to Dismiss filed by

Defendants Uber Technologies, Inc.; Rasier, LLC; and Rasier-CA, LLC (collectively

"Uber"), ECF No. 45, will be denied.

**II.     FACTUAL AND PROCEDURAL HISTORY**

As set forth in this Court's prior Memorandum Opinion, ECF No. 39:

The above-named Plaintiffs (collectively "Plaintiffs") filed a June 11, 2019

Complaint, ECF No. 1, followed by a July 12, 2019 First Amended Complaint, ECF No.

1

10, seeking class certification and injunctive and declaratory relief.  Plaintiffs are Pennsylvania residents and a non-profit corporation headquartered in Pittsburgh, Pennsylvania;[1] Defendants are Delaware corporations.  Uber provides a ridesharing service which allows mobile smartphone application ("Uber App") users to call an available vehicle driver when they need transportation.

Plaintiffs - like other plaintiffs in similar actions filed in Federal District Courts against Uber or Lyft, Inc., another ridesharing transportation company - allege that Defendants are in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, (the "ADA").  Plaintiffs allege Defendants' violation of both (1) Section 12182's prohibitions of disability discrimination with regard to places of public accommodation and (2) Section 12184's prohibitions with regard to public transportation services provided by private entities.[2]  More specifically, Plaintiffs allege that individuals such as themselves, who rely on wheelchairs for mobility and thus also wheelchair accessible vehicles ("WAVs") for transportation, are injured by Defendants'

---

[1] Plaintiff Pittsburghers for Public Transit ("PPT"), a project of Thomas Merton Center, Inc., is a public transportation advocacy organization whose members include two individual Plaintiffs and others with mobility disabilities.  ECF No. 10 at 4.  As discussed *infra,* Plaintiff PPT has associational standing.

[2] *See* First Amended Complaint, ECF No. 10 at 22-23;  ECF No. 35 at 3 (asserting that Defendants' ADA violations have deterred their "patronage of or otherwise interfere[d] with [their] access to a place of public accommodation"); ECF No. 50 at 3 (asserting that Defendants are covered by Title III both via Uber's operation of places of public accommodation, *i.e.*, Uber cars, and as a private provider of transportation services); discussion *infra*.

*See also* 42 U.S.C. § 12182 (prohibiting discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation"); § 12184 (prohibiting disability discrimination as to "specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce").

failure to provide any access to its on-demand ridesharing transportation service to disabled individuals requiring WAVs in Allegheny County, Pennsylvania.[3]

Plaintiffs' allegations include that:

> Because the geographic area serviced by accessible public transportation in Pittsburgh is contracting, at the same time that Uber and similar ride sharing services are capturing market share from traditional taxi companies, Uber's discriminatory practices have a profound negative impact upon individuals with mobility disabilities in Pittsburgh . . .
>
> . . . Uber has the ability to provide accessible service without significant disruption to its business model. Uber tightly controls all aspects of how both its drivers and riders use the service, mediating all payments, regulating the types of vehicles the drivers use, and offering financial incentives to ensure that there are enough drivers on the road to meet the demand for rides. Moreover, Uber is already providing widespread wheelchair accessible transportation in London and six other cities around the United Kingdom.

ECF No. 10 at 1-2.

Defendants filed a Motion to Compel Arbitration, ECF No. 24, on August 23, 2019, which was denied by this Court's Memorandum Opinion and Order, ECF Nos. 39 and 40, respectively, on November 12, 2019. In so holding, the Court expressly rejected Defendants' assertions that Plaintiffs were bound to the arbitration provisions of Uber's Terms of Use and/or equitably estopped from refusing to arbitrate[4] because (1) their

---

[3] Customers signing up for Uber's services must download and create an account using the Uber App. The terms and conditions required to be accepted to use the Uber App ("Terms of Use") include an arbitration provision. Plaintiffs further allege that each individual Plaintiff (1) would use Uber but for the unavailability of WAVs and (2) has not downloaded Uber's application because s/he knows that doing so would be futile while WAVs are unavailable through Uber in Pittsburgh. Defendants do not dispute that no named Plaintiff has created an account or entered into a service agreement with Uber.

[4] As discussed at some length in this Court's prior Memorandum Opinion, ECF No. 39, the doctrine of equitable estoppel permits enforcement of an arbitration clause against a non-signatory in certain limited circumstances, such as where a plaintiff's claim relies on a defendant's breach of other terms of the same contractual agreement. *Cf. Scottsdale*, 253 F.Supp.3d at 802-03 (holding non-signatory bound to defendant

3

claims necessarily "implicate" Uber's Terms of Use and/or (2) their Article III standing to sue as deterrence-injury plaintiffs requires them to "stand in the shoes" of "actual Uber Rider App users who all are bound by Uber's Terms of Use." *See generally* ECF No. 39 ("Defendants' liability, if any, arises from their conduct as measured against the provisions of Federal law. The *sine qua non* is the ADA.");[5] *id.* ("To be clear, then, an individual's standing to bring a claim for disability discrimination under the ADA is not dependent on his/her undertaking futile gestures. To the contrary, such plaintiffs have their own standing; their deterrence-based injury is actual, cognizable and their own.") (citing 42 U.S.C. § 12188(a)(1)'s statement that ADA protections include any person "who has reasonable grounds for believing" s/he will be subjected to discrimination).[6]

---

insurer's arbitration provisions where claims depended "almost entirely on the scope of [insurer's] policy and the coverage . . . owed its insured" and noting that "the instant case concerns equitable subrogation"). *Cf.* ECF No. 39 at 6 n. 4. Defendants' interpretation of precedent/the law in this respect and others has sometimes strayed from the well-reasoned advocacy this Court hopes to receive from qualified counsel. *Cf. also e.g., id.* at 10 n. 10 (discussing Defendants' "fundamental misreading" of *Teamsters*); *cf. generally* discussion *infra*.

[5] *See also Namisnak v. Uber Technologies, Inc.*, 315 F.Supp.3d 1124, 1128 (N.D. Cal. 2018) ("It is Uber's alleged refusal to comply with the requirements of the ADA, not the requirements of its consumer agreements, which forms the basis of this lawsuit.")

[6] As the Court noted in its prior Memorandum Opinion, ECF No. 39:

> The Ninth Circuit's Opinion in *Pickern* affirmed the applicability of *Teamsters'* "futile gesture" doctrine to determinations that deterrence-based injuries are independent, cognizable claims under the ADA." *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 366-67 (1977) (holding that one "can be a victim of unlawful discrimination entitled to make-whole relief" despite being unwilling "to engage in a futile gesture" or "useless act", or "subject [oneself] to the humiliation of explicit and certain rejection"); *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1136 (9th Cir. 2002) (citing Section 12188(a)(1) and noting that these provisions "[s]eek to avoid unreasonable burdens on ADA plaintiffs"); *id.* ("Congress specifically intended that Teamsters' 'futile gesture' reasoning be applied to ADA claims. See H. Rep. No. 101-485(II) at 82-83 (1990) reprinted in 1990 U.S.C.C.A.N. 303, 365 ('The Committee intends for this doctrine to apply to this title')");

4

The case was then administratively stayed pending Defendants' interlocutory appeal to the Third Circuit Court of Appeals. The Court of Appeals having affirmed this Court's arbitrability decision[7], the case was reopened in April, 2021. Now before the Court and ripe for review is Defendants' Motion to Dismiss, ECF No. 45. Plaintiffs' Response in Opposition was filed at ECF No. 50, and Defendants' Reply in Further Support at ECF No. 51.

### III. APPLICABLE STANDARD – RULE 12(b)(6)

The United States Court of Appeals for the Third Circuit summarized the standard to be applied in deciding motions to dismiss filed pursuant to Rule 12(b)(6):

> Under the "notice pleading" standard embodied in Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must come forward with "a short and plain statement of the claim showing that the pleader is entitled to relief." As explicated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a claimant must state a "plausible" claim for relief, and "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

---

*id.* at 1135 ("[W]hen a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers . . . that plaintiff need not engage in the 'futile gesture' of attempting to gain access in order to show actual injury."); *id.* at 1139 (holding that deterrence injury plaintiff had "standing under the ADA and under Article III"); *Access Living of Metro. Chicago v. Uber Technologies, Inc.*, 351 F.Supp.3d 1141, 1150 (N.D. Ill. 2018)("[Plaintiffs'] allegations that they are currently deterred from using Uber and that Uber has no intention of making modifications establish [their standing] to seek prospective injunctive relief.").

*Cf. Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1042 (9th Cir. 2008) (holding that when a disabled individual "become[s] aware of alleged ADA violations that deter his patronage of or otherwise interfere with his access to a place of public accommodation, he has already suffered an injury in fact traceable to the defendant's conduct and capable of being redressed by the courts, . . . ."); *accord Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 480 (3d Cir. 2018) (where plaintiffs allege they are deterred from attempting access to defendant's services, "injury providing Plaintiffs with standing to seek injunctive relief is not merely hypothetical or even imminent—it is actual, in that this allegedly unlawful deterrence is something that Plaintiffs are currently suffering."). *Compare* ECF No. 46; *infra* Section IV(A) (discussing Defendants' current contentions regarding standing).

[7] *O'Hanlon v. Uber*, No. 19-3891 (3d Cir. Mar. 17, 2021).

5

> Although "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213 (quotation marks and citations omitted); *see also Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 117-18 (3d Cir. 2013).

*Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014). In addition, "[w]hen reviewing a motion to dismiss, we construe the complaint in the light most favorable to the plaintiff. . . . . [W]here there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (citations and internal quotation marks omitted).[8]

## IV.    ANALYSIS

Defendants raise the following grounds for dismissal: (A) Plaintiffs "lack a private right of action" under the ADA because the individual Plaintiffs "allege, at most, that [individual Plaintiffs] are 'about to be' subjected to discrimination, but not any violation of Section 12183"; (B) Plaintiffs fail to state a claim under Section 12182 as Uber does not operate a "place of public accommodation"; (C) Plaintiffs fail to state a claim under Section 12184, as it does not require covered entities to provide WAV

---

[8] As Defendants observe, a jurisdictional challenge may be facial or factual. A facial attack concerns an alleged pleading deficiency; a factual attack concerns the failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites. *The Constitution Party of Pa. v. Aichele,* 757 F.3d 347, 358 (3d Cir. 2014). In reviewing a facial attack, the court must generally only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff. In reviewing a factual attack, the court must permit the plaintiff to respond with rebuttal evidence in support of jurisdiction, and the court then decides the jurisdictional issue by weighing the evidence. If there is a dispute of a jurisdictionally-material fact, the court must conduct a plenary hearing on the contested issues prior to determining jurisdiction. *See Lincoln Be. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015).

service; and (D) the PPT lacks organizational or associational standings. *See generally*, Defendants' Brief in Support, ECF No. 46.[9]

### A. Individual Plaintiffs' Deterrence Injury Provides ADA Title III Standing

Having been set right once in their challenge to Plaintiffs' standing to bring this action, Defendants present an inventive but misguided alternative attack. This Court, like others, has rejected Defendants' assertion that plaintiffs who have not downloaded their Uber App – and thus become bound to Uber's arbitration provisions and barred from Federal court – lack Article III standing because they have not been injured. *See supra*. Defendants now assert that even if, as this Court concluded, Plaintiff's deterrence injury is sufficient to standing under Article III, it is insufficient to Plaintiff's standing under the ADA itself because they "have avoided being subjected to the alleged discrimination". ECF No. 46; ECF No. 51 at 2. Rather, Defendants would have it, deterrence injury may suffice only as to "statutory standing" to bring an anticipatory construction-based claim under Section 12183, which applies to "new construction or alterations". *See* ECF No. 46 at 8-11; ECF No. 51 at 2. Defendants continue to fundamentally err in their understanding of the legal concept/import of deterrence-based injury under the ADA (and perhaps more broadly).[10]

---

[9] Defendants also assert that Plaintiffs' claim for declaratory relief should be dismissed as "superfluous". *Id.* Because the Court concludes that Defendants are unentitled to dismissal of any other claim on any proffered ground, and because development of the facts in this litigation and/or others, may well bring to light or give rise to circumstances under which a form of declaratory relief becomes appropriate, the Court declines Defendants' request for dismissal of that claim as premature.

[10] The Court must also emphasize , in response to Uber's briefing, that Defendants' selective cherry-picking and mistaken extrapolations from the legislative history notwithstanding, the overarching purpose of the ADA is to "invoke the sweep of Congressional authority . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b). The ADA was

7

As explicated in this Court's prior Memorandum Opinion, ECF No. 39, Plaintiffs have Article III standing – the only standing previously challenged - through their deterrence-based injury, which is actual, cognizable and their own.  *See supra* at 4 & n. 6; ECF No. 39 at 8-12; ECF No. 50 at 3-5.  In other words, Plaintiffs are not "about to be injured"; as this Court and others have repeatedly held, they are injured.  As also reflected in the Court's prior Memorandum Opinion - and as a necessary component in similar litigations proceeding against Uber or another ridesharing transportation entity in other Federal courts[11] – Plaintiffs are properly positioned to "assert claims against Uber based on rights created by the ADA" and their exclusion – "*by Defendants' disability discrimination* – from participation in . . . available public transportation." ECF No. 39 at 6-7 (emphasis added); *id., generally*.  *Cf.* ECF No. 46 at 8 ("[B]y its plain language, § 12188 provides a broad right of action to private persons who are being subject to discrimination . . . .").  In other words, Plaintiffs also have Title III standing to bring claims, as other plaintiffs have done in other actions nationwide, under Sections

---

enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* The purpose of Title III is, correspondingly, "to bring individuals with disabilities into the economic and social mainstream of American life . . . in a clear, balanced, and reasonable manner." H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 99 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 382.  And in drafting Title III Congress intended that people with disabilities have equal access to the goods and services offered by private establishments and made available to others.  S.Rep. No. 116, 101st Cong., 1st Sess. at 58 (1989).

[11] *See* ECF No. 50 at 6 (citing *Access Living of Metro. Chicago v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141, 1149-51 (N.D. Ill. 2018); *accord Lowell v. Lyft, Inc*., 352 F. Supp. 3d 248, 256 (S.D.N.Y. 2018); *Namisnak v. Uber Techs., Inc*., No. 17-cv-06124-RS, 2018 WL 7200717, at *6 (N.D. Cal. Oct. 3, 2018); *Crawford v. Uber Techs., Inc.*, No. 17-cv-02664-RS, 2018 WL 1116725, at *3 (N.D. Cal. Mar. 1, 2018); *Nat'l Fed'n of the Blind of California v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1081 (N.D. Cal. 2015); *Ramos v. Uber Techs., Inc.*, No. SA14-CA-502-XR, 2015 WL 758087, at *7-9 (W.D. Tex. Feb. 20, 2015)).

12182 and/or 12184.¹² Provisions of the ADA extending *further* protection from discrimination to disabled individuals who would be injured by the new or remodeling construction of places of public accommodation as planned/designed – such that the commercial and social costs of discriminatory construction may be averted by an earlier Section 12183 challenge to, *e.g.*, address appropriate design modifications in advance – are simply irrelevant to Plaintiffs' Title III standing as individuals whom Uber is *presently* excluding from its putative operation of places of public accommodation and/or a public transportation service.¹³ *Compare* ECF No. 46 at 8-11.

---

¹² The Court again directs Defendants to its prior Memorandum Opinion. *See e.g.,* ECF No. 39 at 9 ("To be clear, then, an individual's standing to bring a claim for disability discrimination under the ADA is not dependent on his/her undertaking futile gestures."); *id.* at n. 8 (citing *Access Living,* 351 F.Supp.3d at 1150) ("[Plaintiffs'] allegations that they are currently deterred from using Uber and that Uber has no intention of making modifications establish [their standing] to seek prospective injunctive relief."). *Cf. id.* at 11 n. 11 (citing *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1135, 1139 (9th Cir. 2002) (noting Ninth Circuit's holding that "when a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers . . . that plaintiff need not engage in the 'futile gesture' of attempting to gain access in order to show actual injury" and that deterrence injury plaintiff had "standing under the ADA and under Article III"); *Chapman v. Pier 1 Imports (U.S.), Inc.*, 631 F.3d 939, 950 (9th Cir. 2011) (*en banc*) (concluded that plaintiff had Article III standing "because 'a disabled individual who is currently deterred from patronizing a public accommodation due to a defendant's failure to comply with the ADA has suffered actual injury'") (quoting *Pickern*).

¹³ In sum, as Plaintiffs note:

> The statutory text of the ADA makes clear that there is no limitation in applying the futile gesture doctrine to claims made under Title III . . . . Uber's argument not only misreads the statute, it also ignores the vast body of case law interpreting deterrence-based standing under the ADA, including this Court's ruling on Uber's motion to compel arbitration. ECF No. 39, at 9. Courts around the country have affirmed that a plaintiff need not commit "futile gestures" in order to be injured and have standing to bring the full range of discrimination claims covered by Title III . . . .

ECF No. 50 at 5-6 (providing case citations).

### B. Plaintiffs Have Sufficiently Stated a Claim Under § 12182

Title III, Section 12182 prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." *See* § 12182; 28 C.F.R. § 36.202.[14] A majority of Circuit courts to analyze the definition of a place of public accommodation - including the Third, Fifth, Sixth and Ninth Circuits - have held that it must be a physical location.[15] A particularized question before this Court, however –

---

[14] The statute defines a place of public accommodation by reference to the following categories, which the United States Supreme Court has directed should be liberally construed:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
> (B) a restaurant, bar, or other establishment serving food or drink;
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
> (G) a terminal, depot, or other station used for specified public transportation;
> (H) a museum, library, gallery, or other place of public display or collection;
> (I) a park, zoo, amusement park, or other place of recreation;
> (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;
> (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and
> (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C.A. § 12181(7); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676-77 (2001).

[15] *See* ECF No. 46 at 11 (providing case citations). A minority of other Circuits – including the First and Second Circuits (and the Seventh Circuit in *dicta)* - have taken a more expansive view of "place of public accommodation".

determinable only as a mixed question of law and fact, and potentially a matter of first impression as the case proceeds - is whether the transportation vehicles putatively operated by Uber in its "travel service" enterprise are places of public accommodation under Section 12182.

The Third Circuit has held that a place of public accommodation under Title III is "restricted" and "confined" to – *i.e.* encompasses only - physical "places". *See Ford v. Schering-Plough Corp.*, 145 F.3d 601, 614 (3d Cir. 1998) (holding that plaintiff failed to state a claim under Title III because the provision of disability benefits by employer's

---

There is also a related and evolving split of authority regarding the applicability of Title III to the websites or apps of "internet-only" service providers. For example, the Ninth and Eleventh Circuits (and District Courts within the Fifth Circuit) have concluded that Section 12182 applies to the accessibility of an internet-only service provider's website or mobile app itself only where there is sufficient nexus between it and a "place of public accommodation", *i.e.*, a physical location within the twelve statutorily referenced categories of places available to the public. *See e.g.*, *National Federation of the Blind v. Target Corp.*, 452 F. Supp. 2d 946 (N.D. Cal. 2006). Conversely, the First and Second Circuits (and the Seventh Circuit in *dicta*) have concluded that a private website or app *itself* may constitute a place of public accommodation subject to the ADA even absent nexus to a physical world location operated by the defendant. And as the parties observe, several recent cases in this District have held that a plaintiff has a cognizable claim under Title III where the alleged discrimination (such as an inability to access financial services) occurs at the virtual property (*e.g.*, the website) owned/operated/controlled by defendant. *See e.g. West v. DocuSign, Inc.*, 2019 WL 3843054 at *4 (W.D. Pa. 2019). Compare ECF No. 46 at 13 *with* ECF No. 50 at 16 (discussing *West* and other cases decided by Judge Schwab in the Western District of Pennsylvania).

It is important to note, however, that these cases pertain to the accessibility of a website or app itself – as by, *e.g.*, to the deaf through closed captioning or to the blind through compatibility with screen reader software. *See* ECF No. 50 at 15 (distinguishing cases cited by Defendants). The question of whether such *virtual* accessibility claims rise or fall with a challenged website/app's nexus to a physical place of public accommodation differs from the Section 12182 question in this case challenging Uber's failure to provide mobility-disabled individuals access to the Uber *vehicles* providing its travel and/or public transportation services. *See* discussion *infra*. But cf. ECF No. 50 at 17 (asserting in the alternative that Uber's ownership/control of its app - as well as vehicles – independently and sufficiently supports Plaintiffs' theory of liability under Section 12182). To the extent Plaintiffs assert an alternative theory under Section 12182, the Court need not make a determination at this time; on initial review on Defendants' Motion to Dismiss, it therefore notes only an apparent tension between the Third Circuit's holdings and application of Section 12182 in a claim premised solely on ownership/lease/operation of a website or app. *See* discussion *infra*. Cf. *Namisnak*, 2018 WL 7200717 at *4 (Uber App is not a place of accommodation under Section 12182).

insurer does not qualify as a public accommodation); *id.* ("[W]e do not find the term "public accommodation" or the terms in 42 U.S.C. § 12181(7) to refer to non-physical access . . . ."); id. at 612-13 ("The plain meaning of Title III is that a public accommodation is a place, leading to the conclusion that '[i]t is all of the services which the public accommodation offers, not all services which the lessor of the public accommodation offers[,] which fall within the scope of Title III.' . . . Furthermore, the 'goods, services, facilities, privileges, advantages, or accommodations' concerning which a disabled person cannot suffer discrimination . . . all refer to the statutory term 'public accommodation' and thus to what these places of public accommodation provide. [Plaintiff] cannot point to these terms as providing protection from discrimination unrelated to places.") (citations omitted).[16] In *Ford*, the Third Circuit aligned itself with the Sixth Circuit's holding that "the clear connotation of the words in § 12181(7) is that a public accommodation is a physical place" and declined consideration of the ADA's legislative history as unnecessary. *See Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (more fully describing a place of public accommodation as a physical place open to public access where services may be obtained);[17] ECF No. 46 at 13 (citing some of the Third Circuit's reiterations that a place

---

[16] *See also Peoples v. Discover Fin. Servs., Inc.*, 387 F.App'x 179, 183 (3d Cir. 2010) ("Our Court is among those that have taken the position that the term . . . is limited to physical accommodations.").

[17] The Sixth Circuit's 1997 statement that a travel service is "an office where travel agents provide travel services" – in distinguishing that an office constituted a physical place of public accommodation under Section 12182 – may inform whether, 25 years later, Uber's novel business model components comprise a "travel service", but it is not determinative of whether the vehicles in which Uber riders are transported are 'places of public accommodation". *See* ECF No. 51 at 4.

12

of public accommodation is a "physical place"); *id.* at n. 3 ("[T]he Third Circuit has held that, in the context of Title III . . ., the term public accommodation is limited to *physical* accommodations.") (quoting *Demetro v. Nat'l Ass'n of Bunco Investigations*, 2019 WL 2612687 at *15 (D.N.J. 2019)); *id.* (citing other cases to same effect).

Plaintiffs have asserted that their "claims arise from Uber's failure to provide full and equal access to a physical space: the vehicles in which Uber's customers receive the service." ECF No. 50 at 15. *Compare* ECF No. 46 at 3 ("Plaintiffs cannot state a claim against Uber under Section 12182 . . . . [as t]he Uber Rider App is not an actual, physical place. It is software for smartphones."); *id.* at 12.[18] This Court holds that Plaintiffs have sufficiently stated a Section 12182 claim under the standard presently applicable on a motion to dismiss. *See* ECF No. 50 at 17 ("The majority of courts to consider the issue have concluded that, at least for pleading purposes, Uber's vehicles are places of public accommodation.") (citing *Access Living, Nat'l Fed'n of the Blind of California* and *Lowell;* citing *Namisnak* to the contrary). *But see* ECF No. 51 at 4 & n. 3 (citing two cases in which District Courts held trucks and vans were not places of public accommodation, and noting decisions that vehicles are not places of public accommodation under the Civil Rights Act); ECF No. 46 at 12 n. 4. The allegations plausibly describe a physical place of public accommodation for the provision of travel services to members of the public, and

---

[18] *Cf.* ECF No. 46 at 1 ("Uber does not own, operate, manage, or maintain Driver's vehicles. It does not employ drivers."). Each of these assertions is being litigated in the Federal District and State Courts considering Uber's assertions that its business model may freely operate outside the constraints of, *e.g.*, the provisions of Federal employment or discrimination laws referenced in those various actions. And the factual development and determinations made therein will continue to inform the proceedings in this case. *See* Section V, *infra*.

13

Uber has fallen short of its burden of establishing that Uber vehicles are excluded by either the statutory language of Section 12182 or the interpretive law of this Circuit such that this claim should be dismissed at this juncture.

### C. Plaintiffs Have Sufficiently Stated a Claim Under § 12184

As noted earlier, Section 12184 prohibits disability discrimination as to "specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." *See supra* at 2 n. 2. Title III defines "specified public transportation" as any conveyance provided to the "general public with general or special service . . . on a regular and continuing basis." § 12181(10). And Section 12184 requires that covered entities make "reasonable modifications in policies, practices or procedures" to provide disabled individuals "full and equal" access to their services. § 12184(b)(2)(A).

Uber acknowledges that Section 12184 "applies to private entities that are 'primarily engaged in the business of transporting people'" but disputes that it is a covered entity rather than a software provider to independent drivers.[19] More importantly it asserts that determination is unnecessary, for even if Uber is a covered entity, Plaintiffs have no claim under Section 12184 because Title III "does not require

---

[19] *Compare* ECF No. 50 at 10 (alleging that "Uber sets and collects fares, tells the drivers where to go, mediates communications between riders and drivers, and places restrictions on driver conduct and the types of vehicles they may drive. Riders contract with Uber, not the drivers, to receive transportation services. Uber's name has become synonymous with using any on-demand point-to-point transportation.") (citations omitted); *id.* (discussing some of the cases in other District Courts to consider Uber's relationship to its drivers and status as a transportation provider under the ADA). *Cf. Namisnak* 444 F.Supp.3d 1136 (N.D. Cal. 2020); *Equal Rights Ctr. v. Uber Techs., Inc.*, 17-CV-1272 (KBJ), 2021 WL 981011 (D.D.C. Mar. 15, 2021)

private entities to provide WAVs or WAV transportation" and thus "by negative inference" and as a matter of law, "it is not 'discrimination' under Section 12184 for covered entities to offer only non-WAV service." ECF No. 46 at 2, 14, 16. In so doing, it proffers both an overly-narrow reading of the Section's provisions themselves and a *non sequitur*.

First, Uber correctly represents that Section 12184 expressly does not require a covered entity to redress discrimination in its services by supplementation or modification of its fleet of vehicles through the purchase or lease of accessible automobiles or vans; and a transportation service is free to forego the provision of any *van* transportation as part of its enterprise. If, however, a service provider elects to purchase or lease new vans (as opposed to new automobiles), it is required – in keeping with the purposes and objectives of the ADA and Title III - to obtain accessible (*i.e.*, WAV) vans. *See* Section 12184; 42 U.S.C. § 181886(a)(1); ECF No. 46 at 15. In other words, Section 12184 both provides a limited vehicle purchase/lease exemption and, in specified circumstances, does expressly "require private entities to provide WAVs" as part of a transportation service fleet.[20] Beyond the law cited in the parties' briefing, the Court is unaware of any governing law more directly addressing/interpreting the applicability of Section 12184 to the circumstances of Uber's inventive business model (which does not entail the same cost considerations - *e.g.*, the vehicle fleet purchase or

---

[20] *Cf.* ECF No. 50 at 11 ("[I]f a covered entity is purchasing certain types of new vehicles (such as vans), they are required to ensure that those vehicles are accessible, or at least that the entity's overall level of service for people with disabilities is equivalent to that provided to the general public.") (citing § 12184(b)(3), (5); ECF No. 46 at 16.

15

lease expenditures - traditionally incurred by a transportation service).  It is clear, however, that Section 12184 does not contain a blanket exemption from the provision of WAV service; to the contrary.

Relatedly and more importantly, as Plaintiffs correctly note, "the ADA does not focus narrowly on the purchase of vehicles to achieve its broad goal of full and equal access for people with disabilities.  Its mandate is broader, and more balanced: covered entities must make reasonable modifications to their service in order to make it accessible to people with disabilities." ECF No. 50 at 1-2.  In other words, the inclusion of a particularized exemption balancing competing considerations under the ADA – *i.e.*, by providing that transportation service enterprises not be statutorily obligated by enactment of Title III to purchase or lease new accessible fleet vehicles  - cannot reasonably be read to negate the over-arching goals and mandate of Section 12184: that a private entity electing to primarily engage in the business of transporting people fully include those with disabilities and provide reasonable accommodations in furtherance of that objective.  *See* ECF No. 50 at 11 ("Uber's narrow interpretation has been rejected by every court to consider it."); *id.* (citing *Crawford*, 2018 WL 1116725 at *4 ("Uber's fixation on whether WAVs are specifically required by statute is unavailing in light of the broad language of the ADA . . . Uber could very well be required to provide WAV service through some mechanism in order to comply with the anti-discrimination provisions of Section 12184(b)(2)."); *id.* at 13 (identifying potential reasonable modifications, such as "incentivizing existing drivers of WAVs to join Uber's fleet; partnering with third party entities such as paratransit services or taxi companies;

including WAVs among its 'recommended' cars; and offering incentives for drivers to lease WAVs, as it does for other types of vehicles").[21]

### D. The PPT Has Associational Standing

As noted *supra* at 2 n. 1, Plaintiff PPT is a project of Thomas Merton Center, Inc., a public transportation advocacy organization whose members include two individual Plaintiffs and others with mobility disabilities. Under the well-established doctrine of associational standing, an organization may establish standing where as here: (1) its members have standing to sue on their own; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires individual participation by its members. *Pennsylvania Prison Soc. v. Cortes*, 508 F.3d 156, 163 (3d Cir. 2007) (citing *Hunt v. Wash. State Apple Advert. Comm'n*,

---

[21] *See also* ECF No. 50 at 12-13 (providing analysis of Uber's "similarly misguided" reliance on parallel DOT regulation stating that "providers of taxi service are not required to purchase or lease accessible automobiles", clarifying the holding of *Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2002), and noting that taxi services remain required to make reasonable modifications to ensure access to their service).

The Court supplementally notes that neither (a) a case-specific determination that a particular taxi entity's business modifications need not include the addition of any accessible vehicles nor (b) the absence of a statutory "mandate that all private transportation entities provide accessible vehicles" calls into question the applicability in this case of the broad legislative objectives of "full and equal access" routinely enforced through judicial determination of the transportation service modifications/accommodations reasonably warranted under Section 12184. *Compare* ECF No. 46 at 15-17; *id.* at 17 (presenting a hypothetical "thought experiment" in which a livery company with a fleet of inaccessible automobiles purchases a non-WAV van and thus runs afoul of Section 12184's express prohibition of that purchase as "discrimination" but – in another string of mischaracterizations, strawmen and/or *non sequitur* – concludes that the violation is of the express prohibition and "not [a] failure to provide equivalent service", the court would be without authority to require the livery company to provide equivalent service, and thence to "the upshot" that "there are no circumstances under which any for-hire vehicle service may be compelled to provide WAV services"); *id.* (objecting to other courts' "suggest[ions] that Uber [could] be required to provide some measure of WAV service"). Defendant's assertions regarding the necessity of "jettisoning" (as an "unreasonable interpretation") the DOT's guidance on the statutory vehicle purchase/lease requirements to allow Plaintiff's Section 12184 claim to proceed are patently meritless. *See id.* at 19; *cf. id.* (citing 49 C.F.R. § Pt. 37, App'x D (DOT's "explicit guidance that '[u]nder the ADA, no private entity is required to purchase an accessible automobile'").

432 U.S. 333, 343 (1977)). *See also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) ("The doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others.").[22] Claims seeking declaratory and injunctive relief do not require individualized participation in the suit because such relief "inure[s] to the benefit of" the organization's injured members. *Id.* at 288 (internal quotation marks omitted); *see also Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 284 n. 6 (3d Cir. 2002). *Cf. Equal Rights Ctr.*, 2021 WL 981011 (D.D.C. 2021); *Nat'l Fed'n of the Blind of California*, 103 F. Supp. 3d 1073 (N.D. Cal. 2015)

In addition, as Plaintiffs observe, (a) the factual inquiry in this case will be focused almost entirely on Uber and (b) the possibility that one or more of an organization's members may have downloaded the Uber App and thus been bound to arbitrate disputes with Uber does not negate its standing based on members who did not. *See e.g.,* ECF No. 50 at 8 (citing *Nat'l Fed'n of the Blind of California*, 103 F. Supp. 3d at 1079); *cf.* ECF No. 46 at 20-21. As PPT has associational standing, Uber's assertions regarding its lack of a private right of action as an individual with a disability or an organization sustaining concrete injury via diversion of resources, and/or its failure to meet standing under the provisions of 42 U.S.C. § 12182(b)(1)(E)[23], present – as did its

---

[22] *Compare* ECF No. 46 at 19 ("Organizations may sue on their own behalf only if they have Article II standing in their own right.").

[23] This subsection - which Defendants identify as the "lone, limited exception, in which an entity or individual without a disability may be 'a person . . . subjected to discrimination on the basis of disability'

18

direction of this Court's attention to the anticipated construction provisions of § 12183 and its discussion of the vehicle fleet WAV purchase/lease provisions of § 12184 as precluding Plaintiffs' claim thereunder – detours to the Court's determinations on Defendants' Motion to Dismiss. *Compare* ECF No. 46 at 2 ("The Entity Plaintiff lacks a private right of action because it is not an individual with a disability and because it does not allege that the entity itself was denied services because of the known disability of an individual with which it has a known association – *the only way for any plaintiff without a disability* to have a right of action under Title III.") (emphasis added); *id.* at 5-7.

## V.   CONCLUSION

As noted in this Court's prior Memorandum Opinion, whether compliance with the ADA requires Uber, a private rideshare entity, to make reasonable business modifications to provide transportation service access to people with mobility disabilities—under either Section 12182 or 12184—is the subject of several ongoing Federal court actions.  It is also one which may be informed by expansion and developments in the operations of rideshare companies in the transportation marketplace as the economy in general and places of public accommodation and public transportation services in particular continue their post-pandemic transitions.

---

who has a right to sue under Title III" - expressly extends protection to an individual or entity denied benefits "because of the known disability of an individual with whom the individual or entity is know to have a relationship or association."  *Id.;* ECF No. 46 at 6-7.

For the reasons set forth in this Memorandum Opinion, the Motion to Dismiss filed by Defendants Uber Technologies, Inc., Rasier, LLC and Rasier-CA, LLC, ECF No. 45, will be denied. A separate Order will be entered.

Dated: June 14, 2021

BY THE COURT:

_____
LISA PUPO LENIHAN
United States Magistrate Judge