**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PAUL O'HANLON, *et al.*,

          Plaintiffs,

    v.

UBER TECHNOLOGIES, INC. et al.,

          Defendants.

Civil Action No. 2:19-cv-00675-LPL

Magistrate Judge Lisa Pupo Lenihan

## ANSWER TO FIRST AMENDED COMPLAINT

Defendants Uber Technologies, Inc. ("Uber"), Rasier, LLC, and Rasier-CA, LLC submit

the following Answer to Plaintiffs' First Amended Complaint (ECF No. 10) ("FAC").

### I.      INTRODUCTION

1.      Plaintiffs bring this action to remedy ongoing discrimination against persons with mobility disabilities who want to, but cannot, use the on-demand transportation service operated by Uber Technologies, Inc. ("Uber").

**ANSWER:** Defendants deny the allegations in Paragraph 1.

2.      Since launching its transportation service in San Francisco in July 2010, Uber has experienced explosive growth, has seized an ever-expanding market share from taxi companies, and is now a major provider of individual transportation services in over 450 cities in the United States, including Pittsburgh.

**ANSWER:** Defendants deny the allegations in Paragraph 2.

3.      Uber is one of the leading companies in the new "sharing economy." It provides on-demand rides to individuals through its network of over 2,000,000 drivers globally. The riders pay Uber through Uber's smart phone application with their credit cards, and Uber splits the payments with its drivers. Uber's rapid growth poses an existential threat to traditional taxi service, and Uber has invested heavily in what it considers to be transportation technologies of the future, including autonomous vehicles. Uber is testing its autonomous vehicle technology in Pittsburgh, San Francisco, Arizona and Toronto.

**ANSWER:** Defendants deny the allegations in Paragraph 3.

4.      Uber has a market capitalization of over $75 billion.

**ANSWER:** Defendants admit that, as of June 28, 2021, Uber Technologies, Inc. had a market capitalization of over $75 billion.

5.     Uber occupies a prominent role in the future of on-demand transportation. However, Uber's policies and practices are discriminatory and deny individuals who need wheelchair accessible vehicles equal access to the service it provides, and prevent them from obtaining the benefits of its service. In the Pittsburgh area, Uber provides no wheelchair accessible vehicles through its transportation service at all. Such conduct violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*

**ANSWER:** Defendants admit that Uber provides no vehicles.  Defendants deny the remaining allegations in Paragraph 5.

6.     Because the geographic area serviced by accessible public transportation in Pittsburgh is contracting, at the same time that Uber and similar ride sharing services are capturing market share from traditional taxi companies, Uber's discriminatory practices have a profound negative impact upon individuals with mobility disabilities in Pittsburgh. The mobility disabled community in Pittsburgh has historically had limited accessible transportation options. The convergence of Uber's discriminatory practices with its increasing market share for on-demand transportation services is making an already bad situation worse.

**ANSWER:** Defendants admit that individuals with mobility impairments in Pittsburgh have historically had limited accessible transportation options.  Defendants deny the remaining allegations in Paragraph 6.

7.     Uber has the ability to provide accessible service without significant disruption to its business model. Uber tightly controls all aspects of how both its drivers and riders use the service, mediating all payments, regulating the types of vehicles the drivers use, and offering financial incentives to ensure that there are enough drivers on the road to meet the demand for rides. Moreover, Uber is already providing widespread wheelchair accessible transportation in London and six other cities around the United Kingdom. Uber could similarly end its discrimination against people in the Pittsburgh area who need wheelchair accessible vehicles if it chose to do so.

**ANSWER:** Defendants deny the allegations in Paragraph 7.

8.     This is not a case about money. This litigation is intended to halt Uber's ongoing discrimination against individuals with mobility disabilities. Plaintiffs seek only injunctive and declaratory relief to redress Uber's violations of the ADA. Plaintiffs contacted Uber to request that it reasonably modify its policies and practices so that persons who need wheelchair accessible vehicles would have full and equal access to the on-demand transportation service Uber provides in Allegheny County. Uber failed to make such modifications, thereby leaving Plaintiffs no choice but to file this lawsuit.

**ANSWER:** Defendants deny the allegations in Paragraph 8.

9.      Because Defendants' practices adversely impact hundreds, if not thousands, of disabled individuals in Allegheny County, Plaintiffs ask the Court to certify their claims for class treatment and to order relief that will benefit all members of the Class.

**ANSWER:** Defendants deny the allegations in Paragraph 9.

## II.      PARTIES

10.      Plaintiff Paul O'Hanlon is an individual residing in Allegheny County. He uses a motorized wheelchair and would use Uber but for the unavailability of wheelchair accessible Ubers. Because Mr. O'Hanlon knows that wheelchair accessible vehicles are not available through Uber in Pittsburgh, he has not downloaded Uber's application because he knows trying to use Uber would be futile.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 10, so the allegations are deemed to be denied.

11.      Plaintiff Jonathan Robison is an individual residing in Allegheny County. He uses a motorized wheelchair and would use Uber but for the unavailability of wheelchair accessible Ubers. Because Mr. Robison knows that wheelchair accessible vehicles are not available through Uber in Pittsburgh, he has not downloaded Uber's application because he knows trying to use Uber would be futile.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 11, so the allegations are deemed to be denied.

12.      Plaintiff Gayle Lewandowski is an individual residing in Allegheny County. She uses a motorized wheelchair and would use Uber but for the unavailability of wheelchair accessible Ubers. Because Ms. Lewandowski knows that wheelchair accessible vehicles are not available through Uber in Pittsburgh, she has not downloaded Uber's application because she knows trying to use Uber would be futile.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 12, so the allegations are deemed to be denied.

13.      Plaintiff Irma Allen is an individual residing in Lawrence County. She uses a motorized wheelchair and would use Uber but for the unavailability of wheelchair accessible Ubers. She has learned that wheelchair accessible vehicles are not available through Uber from other individuals, including other wheelchair users. She has not downloaded Uber's application because she knows trying to use the service would be futile.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 13, so the allegations are deemed to be denied.

14.     Plaintiff Pittsburghers for Public Transit ("PPT") is a project of Thomas Merton Center, Inc., a Pennsylvania non-profit corporation with its headquarters in Pittsburgh, Pennsylvania. PPT's mission is to ensure that transportation is available and accessible to all, including people with limited mobility. PPT's membership includes Plaintiffs O'Hanlon and Robison, and other members with mobility disabilities, who have been deterred from using Uber because of Uber's failure to make its service accessible to them. Plaintiff PPT sues on behalf of itself and its members, and in furtherance of its mission of ensuring that people with disabilities have equal access to transportation.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 14, so the allegations are deemed to be denied.

15.     Defendant Uber Technologies, Inc. ("Uber"[1]) is a for-profit corporation that provides on-demand transportation services throughout Pennsylvania, including in Allegheny County. Uber is registered in Delaware, and its principal place of business is San Francisco, California.

**ANSWER:** Defendants admit that Uber Technologies, Inc. is a for-profit corporation,

incorporated in Delaware and that its principal place of business is in San Francisco, California.

Defendants deny the remaining allegations in Paragraph 15, including any allegations included in

footnote 1.

16.     Defendant Rasier, LLC ("Rasier") is a for-profit corporation registered in Delaware with its principal place of business in San Francisco, California. Rasier is a subsidiary of Uber Technologies, Inc.

**ANSWER:** Defendants admit that Rasier, LLC is a subsidiary of Uber Technologies, Inc.

Defendants deny the remaining allegations in Paragraph 16.

17.     Defendant Rasier-CA, LLC ("Rasier") is a for-profit corporation registered in Delaware with its principal place of business in San Francisco, California. Rasier-CA, LLC is a subsidiary of Uber Technologies, Inc.

**ANSWER:** Defendants admit that Rasier-CA, LLC is a subsidiary of Uber Technologies,

Inc.  Defendants deny the remaining allegations in Paragraph 17.

---

[1] The name "Uber" will be used to refer to all Defendants named in this Complaint.

## III. JURISDICTION

18.     Plaintiffs bring this action for declaratory and injunctive relief under 42 U.S.C. §§ 12101, *et seq.* The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. §§ 12188. The Court has jurisdiction to issue declaratory relief under 28 U.S.C. § 2201 and to order further relief under 28 U.S.C. § 2202.

**ANSWER:** Defendants admit that at the time of the filing of this Answer the Court has

statutory subject-matter jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claim under the

Americans with Disabilities Act ("ADA").  The remaining allegations in Paragraph 18 are denied,

and Defendants specifically deny the Court has constitutional subject-matter jurisdiction over the

case.

## IV. VENUE

19.     Venue is proper in the Western District of Pennsylvania under 28 U.S.C. §§ 1391(b)-(c) because Defendants' maintain an office in this District, Defendants do business in this District, the business practices at issue were conducted throughout Pennsylvania, including in this District, liability arose in this District, and events and conduct giving rise to the violations of law asserted herein occurred in this District. In particular, Plaintiffs all reside in this District, and they have suffered discrimination on the basis of their disabilities and have been deterred from taking advantage of the transportation service offered by Uber in this District.

**ANSWER:** Defendants admit that venue is not improper in this district.  The remaining

allegations in Paragraph 19 are denied, and Defendants specifically reserve all rights to seek a

transfer of venue under 28 U.S.C. § 1404(a) or any other applicable statute or rule.

## V.    CLASS ACTION ALLEGATIONS

20.     Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs bring this action on behalf of themselves and all other persons similarly situated. The Class consists of all individuals with mobility disabilities who need wheelchair accessible vehicles and who have been and continue to be deterred from using Uber's on-demand transportation service in Allegheny County due to Uber's discriminatory acts and practices. Excluded from the Class is any individual who has previously utilized Uber and/or has downloaded the Uber application, and Uber's officers and employees.

**ANSWER:** The allegations in Paragraph 20 purport to define the class Plaintiffs seek to

represent.  To the extent a response is required, Defendants deny the allegations in Paragraph 20

and specifically deny that the putative class can be certified.

21.     Plaintiffs are unable to state the precise number of potential members of the proposed Class. The Class numbers in the hundreds, if not thousands, and members of the Class are sufficiently numerous and geographically diverse that joinder of all members is impracticable.

**ANSWER:** Defendants deny the allegations in Paragraph 21.

22.     There is a well-defined community of interest among the members of the proposed Class in that there are questions of law and fact common to all of their claims. Those common issues include, but are not limited to: whether Uber's policies and practices deny persons who need wheelchair accessible vehicles full and equal access to the on-demand transportation service it provides non-disabled persons in Allegheny County; and whether Uber's policies and practices violate the applicable disability-rights laws.

**ANSWER:** Defendants deny the allegations in Paragraph 22.

23.     Plaintiffs' claims are typical of, and not antagonistic to, the claims of all other members of the Class because Uber conducted and continues to conduct its business in a manner which caused, continues to cause, and will in the future cause all Class members to suffer the same or similar injury. Plaintiffs, by advancing their claims, will also advance the claims of all other similarly-situated individuals.

**ANSWER:** Defendants deny the allegations in Paragraph 23.

24.     Plaintiffs and their counsel will fairly and adequately protect the interests of absent Class members. There are no material conflicts between Plaintiffs' claims and those of absent Class members that would make class certification inappropriate. Plaintiffs' counsel are experienced in disability rights and class action litigation, and will vigorously assert Plaintiffs' claims and the claims of all Class members.

**ANSWER:** Defendants deny the allegations in Paragraph 24.

25.     A class action is superior to other potential methods for achieving a fair and efficient adjudication of this controversy. Whatever difficulties may exist in the management of this case as a class action will be greatly outweighed by the benefits of the class action procedure, including but not limited to providing Class members with a method for the redress and prevention of their injuries and claims that could not, given the complexity of the issues and the nature of the requested relief, be pursued in individual litigation. Further, the prosecution of separate actions by the individual Class members, even if possible, would create a risk of inconsistent or varying adjudications and incompatible standards of conduct for the Defendants.

**ANSWER:** Defendants deny the allegations in Paragraph 25.

## VI.     GENERAL ALLEGATIONS

26.     Uber provides transportation services to members of the general public, including in the City of Pittsburgh and Allegheny County.

**ANSWER:** Defendants deny the allegations in Paragraph 26.

27.     Uber is not a broker or a middleman merely facilitating a transaction through a smart phone application. Instead, it provides transportation to its customers by recruiting and retaining a network of drivers who contractually agree to provide rides to Uber's customers. In all material respects, including the financial terms, the transactions between the drivers and the customers are dictated, mediated, and controlled by Uber. There are no negotiations between Uber's drivers and its customers, and Uber takes the lion's share of the revenues generated in the transactions.

**ANSWER:** Defendants deny the allegations in Paragraph 27.

28.     Uber provides different levels of transportation service around the country. In the City of Pittsburgh and Allegheny County, the company offers: UberX, its basic rideshare option, UberXL, for larger vehicles, and UberPremium, for premium vehicles and top rated drivers.

**ANSWER:** Defendants admit that UberX and UberXL are available marketplaces for registered riders who use the Uber Rider App to obtain rides ("Riders") and independent, third-party transportation providers who sell rides using the Uber Driver App ("Drivers") in the City of Pittsburgh and Allegheny County.   Defendants deny the remaining allegations in Paragraph 28 and specifically deny that Defendants provide any transportation services.

29.     Uber has created a genuinely new mode of on-demand transportation, generating both the demand for rides and the supply of drivers by incentivizing both the riders and the drivers to participate in the service.

**ANSWER:** Defendants deny the allegations in Paragraph 29.

30.     Moreover, Uber perceives itself as creating a new transportation service which transcends the technology. Uber urges commuters to consider it a "daily transportation option" or one that complements their use of other modes of transportation ("While public transportation is still very much a necessity, research has found that Uber acts as an important complement for commuters."[2]). Indeed, one of Uber's strategies is to replace public transportation, identifying a "massive market opportunity" in the trillions of miles traveled by people on public transportation.[3]

---

[2] Uber.com, How Uber Can Be a Daily Transit Option, https://www.uber.com/newsroom/how-uber-can-be-a-daily-transportation-option/, October 5, 2016.
[3] E. Tammy Kim, The New York Times, How Uber Hopes to Profit From Public Transportation, https://www.nytimes.com/2019/05/30/opinion/uber-stock.html, May 30, 3019.

**ANSWER:** Defendants admit that public transportation is a necessity and that research has shown that the Uber platform can complement public transportation.   Defendants deny the remaining allegations in Paragraph 30.

31.     Uber has even compared itself to a utility ("Today we aspire to make transportation as reliable as running water, everywhere and for everyone"[4]) and touted the ability of its transportation service to tackle difficult public policy issues such as "congestion, pollution and parking by getting more people into fewer cars."[5] In Uber's own words: "Our work doesn't end with transporting people."[6] In the words of the United States District Court for the Northern District of California: "Uber does not simply sell software; it sells rides." *O'Connor v. Uber Techs. Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D Cal. 2015).

**ANSWER:** Defendants admit that their technology can assist Riders and Drivers in addressing problems such as traffic congestion, pollution, and parking.   Defendants deny the remaining allegations in Paragraph 31.

32.     Here, in Allegheny County, the Department of Human Services has already considered, and created a pilot program to analyze, how ride-hailing services, such as Uber, could be used as another choice for clients that typically rely on paratransit services.[7] The pilot program study noted, however, the challenges of using Uber because of its inability to accommodate all people with disabilities.[88] Indeed, the program has to be limited to ambulatory clients assigned to paratransit because of the lack of wheelchair accessible Uber services.[9]

**ANSWER:** Plaintiffs allude to a study and press release which speak for themselves. Defendants deny that Plaintiffs' representations about those sources are accurate.   To the extent a further response is required, Defendants deny the allegations in Paragraph 32.

A.     **Uber Discriminates Against Individuals With Mobility Disabilities By Failing To Provide Wheelchair Accessible Vehicles**

---

[4] Uber.com, Celebrating Cities: A New Look and Feel for Uber, https://www.uber.com/newsroom/celebrating-cities-a-new-look-and-feel-for-uber-7/, February 3, 2016.
[5] Travis Kalanick, Uber's Plan to Get More People Into Fewer Cars, https://www.ted.com/talks/travis_kalanick_uber_s_plan_to_get_more_people_into_fewer_cars, February 2016.
[6] Uber.com, Advanced Technology Group, https://www.uber.com/info/atg/
[7] Allegheny County Department of Human Services, Ride-Hailing for Medical Transportation Clients Improves Experience and Efficiency, https://www.alleghenycountyanalytics.us/ index.php/2019/02/05/ride-hailing-for-medical-transportation-clients-improves-experience-and-efficiency/, January 2019.
[8] *Id.*
[9] *Id.*

**ANSWER:** Defendants deny the allegations in the unnumbered heading above.

33.     Uber has been sued in cities around the United States for its violation of disability laws by failing to provide wheelchair-accessible service, yet has continued its policy of denying that service. *See, e.g., Equal Rights Center v. Uber Technologies, Inc.*, No. 17-cv-01272 (D.D.C. filed 6/28/2017), *Access Living of Metropolitan Chicago v. Uber Technologies, Inc.*, No. 16-cv-09690 (N.D. Ill. Filed 10/13/2016), *Crawford v. Uber Technologies, Inc.*, No. 3:17-cv-02664-RS (N.D. Cal. Filed 5/9/2017), *Namisnak v. Uber Technologies, Inc.*, 3:17-cv-06124-RS (N.D. Cal. Filed 10/26/2017) and *Independent Living Resource Center San Francisco, et al., v. Uber Technologies, Inc.*, 3:18-cv-06503 (N.D. Cal. Filed 10/23/2018).

**ANSWER:** Defendants admit the lawsuits in Paragraph 33 have been filed but denies that

they have merit.  The remaining allegations in Paragraph 33 are denied.

34.     Although Uber exercises substantial control over drivers to incentivize them to drive for Uber and to drive at particular times, Uber openly admits that it is doing nothing to incentivize drivers to drive wheelchair accessible Ubers: "[Uber] doesn't treat Drivers who have or want WAVs any differently than it treats other Drivers [sic]." *BCID v. Uber, SDNY,* Case No. 1:17-cv-06399-NRB, Dkt 35 (Defts' Mot. to Dismiss, December 8, 2017 at 7). Just as it has intentionally flouted regulation and law enforcement in other contexts[10], Uber has intentionally avoided complying with anti-discrimination laws by taking no steps in Allegheny County to make full and equal access to Uber's transportation service a reality. Indeed, Uber provides no wheelchair accessible vehicles as a part of its on-demand transportation service in Allegheny County.

**ANSWER:** Defendants admit that Uber provides no vehicles.  Defendants deny the

remaining allegations in Paragraph 34.

### B.     Uber's Discrimination Results In Real Harm

**ANSWER:** Defendants deny the allegations in the unnumbered heading above.

35.     Uber's failure to make accessible vehicles available through its service denies people in Allegheny County who use wheelchairs access to reliable, on-demand transportation that could drastically improve their lives, enabling them to travel to a wider variety of destinations without having to rely on transportation via expensive and unreliable taxis,

---

[10] See, e.g., N.Y. Times, How Uber Deceives the Authorities Worldwide, https://www.nytimes.com/2017/03/03/technology/uber-greyball-program-evade-authorities.html, March 3, 2017; The Recorder, Former Uber CLO Salle Yoo Named in Reports of Tool Meant to Evade Foreign Authorities, https://www.law.com/therecorder/sites/therecorder/2018/01/12/former-uber-clo-salle-yoo-named-in-reports-of-tool-meant-to-evade-foreign-authorities/, January 12, 2018; Eric Newcomber, Uber Pushed the Limits of the Law. Now Comes the Reckoning, Bloomberg.com, https://www.bloomberg.com/news/features/2017-10-11/uber-pushed-the-limits-of-the-law-now-comes-the-reckoning, October 11, 2017.

unreliable paratransit, and limited public transit. It would enable them to travel spontaneously, without having to schedule transportation hours or even days in advance. Unfortunately, Plaintiffs and members of the class are excluded from these benefits, and suffer real harm as a result.

**ANSWER:** Defendants deny the allegations in Paragraph 35.

36.    Further, as Uber attempts to take market-share away from public transportation options, people with mobility disabilities who rely on public transportation and paratransit will suffer the most because of Uber's lack of wheelchair accessible transportation.

**ANSWER:** Defendants deny the allegations in Paragraph 36.

37.    As described below, the lack of access to this new mode of transportation means that Plaintiffs may lose educational opportunities, employment opportunities or jobs to those with access to more reliable transportation, and may experience social isolation and other harms—not least the stigma associated with not being part of what Uber calls the mainstream "way the world moves."

**ANSWER:** Defendants deny the allegations in Paragraph 37.

C.    **Paul O'Hanlon**

38.    Plaintiff Paul O'Hanlon lives in the town of Regent Square, Allegheny County, Pennsylvania. He uses a motorized wheelchair because of mobility disabilities.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 38, so the allegations are deemed to be denied.

39.    Mr. O'Hanlon would and could use Uber if he knew that he could count on it for service. He has access to a smartphone, but he has not downloaded Uber's app. Early in Uber's existence, he was excited by the prospect of finding transportation more easily, but he quickly became aware that there were no wheelchair accessible vehicles available through the Uber app in Pittsburgh. As a result, he has concluded that it would be futile to download the Uber app.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the remaining allegations in Paragraph 39, so the allegations are deemed to be denied.

40.    There are many situations in which Mr. O'Hanlon would use Uber if wheelchair accessible vehicles were available.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 40, so the allegations are deemed to be denied.

41.     Mr. O'Hanlon is an attorney who previously worked for the Disability Law Project, now known as the Pennsylvania Disability Rights Network. He is active in numerous advocacy groups related to transportation services. He chairs the City-County (Pittsburgh-Allegheny County) Task Force on Disabilities. He is a member of, and has held leadership positions with, the Committee for Accessible Transportation. Similarly, he is a member of and was formerly on the advisory committee for Pittsburghers for Public Transit.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 41, so the allegations are deemed to be denied.

42.     In pursuit of his numerous professional and personal interests, Mr. O'Hanlon has had occasion to travel from Pittsburgh to various destinations by way of Greyhound Bus, Amtrak and various commercial airlines. When returning to Pittsburgh by Greyhound or Amtrak, on more than one occasion Mr. O'Hanlon has missed the last city bus and has had to travel several miles by wheelchair between the Pittsburgh Greyhound or Amtrak terminals and his home. On these occasions, he would have used Uber if wheelchair accessible vehicles were available through the service.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 42, so the allegations are deemed to be denied.

43.     Similarly, when Mr. O'Hanlon has returned to Allegheny County International Airport by plane, he has on more than one occasion arrived after the last bus has already left (or after the time at which he would be able to catch a necessary connecting bus). On these occasions, he would have used Uber if wheelchair accessible vehicles were available through the service.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 43, so the allegations are deemed to be denied.

44.     Mr. O'Hanlon sometimes has to attend meetings at locations that are not on the bus line. On these occasions, he would use Uber if wheelchair accessible vehicles were available through the service.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 44, so the allegations are deemed to be denied.

45.     During May 2019, Mr. O'Hanlon had a meeting scheduled in Washington, PA. While there is a bus option to travel between Mr. O'Hanlon's home and Washington, PA, it is inconvenient, and Mr. O'Hanlon would prefer to take an Uber if wheelchair accessible vehicles were available through this service—particularly if the weather is bad.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about

the truth of the allegations in Paragraph 45, so the allegations are deemed to be denied.

46.     Mr. O'Hanlon would generally like to have the option of using Uber if the weather is bad.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 46, so the allegations are deemed to be denied.

47.     In addition, Mr. O'Hanlon would like to have Uber as an available option when he would otherwise be forced to rely upon Paratransit services. This is because Paratransit services require significant advance notice, have limited availability, and a limited service area.

**ANSWER:** Defendants admit that paratransit services generally require advance notice, have limited availability, and a limited service area.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 47, so the allegations are deemed to be denied.

**D.     Jonathan Robison**

48.     Plaintiff Jonathan Robison is a retired lawyer living in the Oakland neighborhood of Pittsburgh, Allegheny County. Mr. Robison has MS and uses a motorized wheelchair.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48, so the allegations are deemed to be denied.

49.     Mr. Robison would and could use Uber if he knew that he could count on it for service. He has access to a smartphone, but he has not downloaded Uber's app. Early in Uber's existence, he was excited by the prospect of finding transportation more easily, but he quickly learned from friends and colleagues about the lack of accessible vehicles on Uber. As a result, he has concluded that it would be futile to download the app.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49, so the allegations are deemed to be denied.

50.     Mr. Robison relies primarily on the public bus service in Allegheny County for transportation, but he would use the Uber service for areas outside of the bus lines service area. For example, he recently wanted to visit a museum that was outside of the service area for the bus line, and was unable to secure alternative transportation. He would have used Uber in this instance if Uber offered wheelchair accessible vehicles.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50, so the allegations are deemed to be denied.

### E.  <u>Gayle Lewandowski</u>

51.     Plaintiff Gayle Lewandowski lives in the town of Bellevue, Allegheny County, Pennsylvania. She uses a motorized wheelchair because of mobility disabilities.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51, so the allegations are deemed to be denied.

52.     Ms. Lewandowski would and could use Uber if she knew she could count on it for service. She has access to a smartphone, but she has not downloaded Uber's app. Early in Uber's existence, she was excited by the prospect of finding transportation more easily, but she quickly learned from friends and colleagues about the lack of accessible vehicles on Uber. As a result, she has concluded it would be futile to download the app.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52, so the allegations are deemed to be denied.

53.     There are many situations in which Ms. Lewandowski would use Uber if wheelchair accessible vehicles were available. For example, Ms. Lewandowski attends classes at the Community College of Allegheny County's North Campus. She previously would have taken an accessible public bus from her home in Bellevue to campus to attend classes. However, this bus route was cancelled as part of a general contraction of bus services by the Port Authority of Allegheny County. Given that the bus service was cancelled, Ms. Lewandowski attempted to use accessible taxis to transport her to her classes. She found the limited accessible taxi service that is available in Allegheny County to be both expensive and unreliable, causing her to either miss class or be late for class on multiple occasions.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 53, so the allegations are deemed to be denied.

54.     If they were accessible to her, Ms. Lewandowski would call Ubers in exactly the same way as would someone who does not use a wheelchair accessible vehicle. She would order Ubers to attend class, as well as to get to appointments and to meetings for organizations where she volunteers.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54, so the allegations are deemed to be denied.

55.     In these situations, Ms. Lewandowski is left without any reliable alternative transportation and therefore must stay at home or suffer arduous transportation delays and other indignities from not having access to the same service as Uber users who do not use accessible vehicles.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 55, so the allegations are deemed to be denied.

### F.     Irma Allen

56.     Plaintiff Irma Allen lives in New Castle, Pennsylvania. She has mobility disabilities and uses a motorized wheelchair. She has access to a smartphone but has not downloaded the Uber app because she has heard from other wheelchair users that there are no wheelchair accessible Ubers in Pittsburgh.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56, so the allegations are deemed to be denied.

57.     Ms. Allen's son lives in the Lawrenceville neighborhood of Pittsburgh. Ms. Allen regularly travels to Pittsburgh for overnight visits both to visit her son and to attend doctor appointments at UPMC Mercy and Presbyterian hospitals. She would like to utilize Uber's on-demand services in Pittsburgh to shop and visit around the city.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 57, so the allegations are deemed to be denied.

58.     Further, in order to attend her doctors' appointments, she has to rely on her son for transportation, which requires her son to take time off work and lose a day's wages. Wheelchair accessible on-demand services from Uber would permit Ms. Allen to attend her appointments without relying on her son for transportation.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 58, so the allegations are deemed to be denied.

### G.     Pittsburghers for Public Transit

59.     PPT serves members throughout Allegheny County to promote its mission of ensuring the availability of, and accessibility of, transit for all people including people with mobility disabilities.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59, so the allegations are deemed to be denied.

60.     PPT has devoted its resources to organizing community members around threats to transit, including infrastructure changes that would reduce access for people with disabilities. The continued inaccessibility of Uber transportation is an issue of concern for PPT.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 60, so the allegations are deemed to be denied.  Defendants deny the remaining allegations in Paragraph 60.

61.     PPT's membership includes people with mobility disabilities who have been deterred from downloading and using Uber because of Uber's failure to make its services accessible to them. Accordingly, many members of PPT have been harmed because of Uber's discriminatory policies and practices resulting in a lack of accessible transportation for people with mobility disabilities in Allegheny County.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61 relating to PPT's memberships, so the allegations are deemed to be denied.  Defendants deny the remaining allegations in Paragraph 61.

62.     PPT itself has been injured as a direct result of Uber's failure to provide a service that is accessible to PPT members who need wheelchair accessible transportation. Uber's discriminatory policies and practices regularly impose economic harms on PPT, frustrate the organization's efforts to engage in its core advocacy work, and force it to divert resources that it needs to spend on other work.

**ANSWER:** Defendants deny the allegations in Paragraph 62.

63.     PPT has spent time and resources on collecting information about the experiences of people with disabilities using transportation services, including rideshare services, to aid it in its advocacy efforts. PPT has spent substantial resources challenging autonomous vehicles, such as those used by Uber, due in part to their lack of accessibility for PPT members with disabilities.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 63, so the allegations are deemed to be denied.

64.     Additionally, PPT members such as Plaintiffs O'Hanlon and Robison have been injured as a direct result of Uber's discriminatory policies and practices, as described above, and each have standing in their own right to sue. PPT can bring this action on behalf of its members because the interests at stake are germane to the organization's purpose and only injunctive and declaratory relief are requested, which do not require the participation of all PPT individual members in the lawsuit.

**ANSWER:** The allegations in Paragraph 64 are denied.

H.     **Uber's On-Demand Transportation Service**

**ANSWER:** The heading above does not include any allegations directed toward Defendants. To the extent a response is required, Defendants deny the allegations in the heading above.

65.     To call an Uber, the customer opens the Uber app, selects which class of vehicle they want and then submits a request to Uber for a vehicle through the app, either for their own use or for other passengers.

**ANSWER:** Defendants deny the allegations in Paragraph 65.

66.     Uber then identifies a close, available Uber vehicle and then notifies the requester either by text message or the Uber app that a driver has been assigned. The notification includes the driver's name, customer rating, phone number, vehicle license plate number, make and model of the vehicle, and the driver's estimated time of arrival. If the customer submitted a desired trip destination, then Uber will provide a fare estimate. The customer can then track the location of the Uber as the driver navigates to the customer's identified pick-up address. The driver and customer can communicate with each other through Uber's app.

**ANSWER:** Defendants admit that if a Rider creates a ride request via the Uber Rider App, and to the extent a Driver is online, nearby, and available, Uber will forward the Rider's request to a Driver, who may then accept it or not. Defendants further admit that, to the extent a Driver accepts the request, the Uber Rider App displays to the requesting Rider the Driver's first name, vehicle make and model, license plate number, estimated time of arrival, Rider star rating, and the current location of the Driver's vehicle on a map. Defendants further admit that the Uber Rider App and Uber Driver App (together, the "Uber Apps") include features facilitating communication between the Driver and Rider. The remaining allegations in Paragraph 66 are denied.

67.     Once the Uber arrives, the Uber app notifies the customer, and they and any other associated passengers may then board the vehicle. The driver then begins the trip in the Uber software app and proceeds to the desired destination. If the requesting customer submitted the destination address, the app will supply the driver with turn-by-turn directions to the desired destination.

**ANSWER:** Defendants admit that the Uber Rider App notifies the Rider who requested a ride when the Rider's Driver arrives, and that the Rider's Driver can use the Uber Driver App to indicate when a trip began.  The remaining allegations in Paragraph 67 are denied.

68.     When the Uber arrives at the desired destination, the driver ends the trip in Uber's app. Uber then charges the customer's credit card for the trip fare. No cash is exchanged. Uber allows the rider and the driver to provide ratings of each other in the app after the ride has concluded.

**ANSWER:** Defendants admit that a Driver can use the Uber Driver App to indicate when a trip has concluded, and that Riders and Drivers are permitted to rate each other in the Uber Apps. The remaining allegations in Paragraph 68 are denied.

69.     Fares for Uber's transportation services are based on the duration and distance of each trip and other factors such as demand at the time and place of the ride, as determined by Uber's algorithms. Uber keeps a percentage of each fare.

**ANSWER:** Defendants deny the allegations in Paragraph 69.

70.     Uber compensates its drivers based on the duration and distance of the trips that they provide to customers. Payments are not transferred directly from customers to drivers; rather, Uber collects and holds customer payments, deducts fees, and then later transfers money to drivers. Customers who dispute the fare for a particular trip must contact Uber customer service representatives to request an adjustment to their fares.

**ANSWER:** Defendants admit that Rider payments are not typically transferred directly from Riders to Drivers and that Uber collects Rider payments, deducts any fees owed to Uber by Drivers, and transfers Rider payments to Drivers. The remaining allegations in Paragraph 70 are denied.

71.     In the Pittsburgh Area, Uber purports to offer various classes of Uber transportation service to the public, including uberX, uberXL, and uberPREMIUM. Customers can order an Uber at any time of day and in any part of Pittsburgh. Although Uber offers UberWAV (Wheelchair Accessible Vehicle) in some cities, Defendants have chosen not to make Wheelchair Accessible Ubers available in Pittsburgh.

**ANSWER:** Defendants admit that  WAV marketplaces are available on the Uber platform in some cities.  The remaining allegations in Paragraph 71 are denied.

### I.     Uber Controls The Transportation Service It Has Created

**ANSWER:** Defendants deny the allegations in the unnumbered heading above.

72.     Uber has created a revolutionary new mode of on-demand transportation that has changed the way millions of Americans get around – so much so that the word "Uber" has become synonymous with convenient, reliable, on-demand transportation. Sometimes Uber distances itself from the fundamental role it has played in creating this system by describing itself as merely a broker or middleman, facilitating connections between drivers and riders which might happen anyway. Nothing could be further from the truth. Uber has created and controls its transportation system in every material respect.

**ANSWER:** Defendants deny the allegations in Paragraph 72.

### J.     Uber Controls The Drivers And Vehicles

**ANSWER:** Defendants deny the allegations in the unnumbered heading above.

73.     Individuals who wish to drive for Uber must undergo a driving record check, background check, present their driver's license, vehicle registration, and driver's insurance. Uber sets standards for which makes, models, and age of vehicle can be driven in the Uber network. These standards are detailed – but nowhere do they mention wheelchair accessible vehicles. Uber-authorized vehicles include a number of vans. Models must be at least 2002 or later, and in many cases Uber requires much more recent models. *See* Uber, Vehicle Requirements Pittsburgh, *https://www.uber.com/drive/pittsburgh /vehicle-requirements*. Uber also sets standards for which makes, models, and age of vehicle can be driven for each class of Uber vehicle, such as UberSUV, UberXL, and UberBLACK.

**ANSWER:** Defendants admit that Drivers seeking to accept ride requests using the Uber Driver App must, in accordance with Pennsylvania law, submit their driver's license information, vehicle registration information, and vehicle insurance information.  Defendants further admit that Drivers' vehicles must meet certain minimum requirements, including those mandated by state or local law, in order to obtain a license to use the Uber Driver App to sell rides.  Defendants further admit that different vehicle requirements apply for Drivers seeking to accept certain ride request options.  Defendants deny the remaining allegations in Paragraph 73.

74.     Uber also makes vehicles available to drivers through partnerships with dealerships that offer rental and lease-to-own options to assist its drivers in obtaining vehicles with which to provide Uber transportation services. *See* Uber, Vehicle Requirements, San Francisco Bay Area, https://www.uber.com/drive/san-francisco/vehicle-requirements/ ("And if you don't have a car, we can help you get one.").

**ANSWER:** Defendants deny the allegations in Paragraph 74.

75.     Uber even exercises control over the engineering and manufacture of vehicles for its service. Uber touts its "Advanced Technology Group," a team that includes hardware and product design engineers. One of the regional headquarters for the Advance Technology Group is located in Pittsburgh. Its goals include "transforming the way the world moves" and "developing long-term technologies that advance Uber's mission of bringing safe, reliable transportation to everyone, everywhere." This work includes self-driving cars and trucks, but not wheelchair-accessible vehicles. *See* Uber, *Advanced Technologies Group*, https://www.uber.com/info/atg/.

**ANSWER:** Defendants deny the allegations in Paragraph 75.

76.     Through its driver contract, Uber dictates whether, when, where, and how frequently Drivers choose to offer rides in Uber vehicles. Uber exercises exclusive control over termination of Uber drivers, and routinely terminates drivers for several reasons, including for poor ratings from customers or discriminatorily refusing to provide service to customers.

**ANSWER:** Defendants deny the allegations in Paragraph 76.

77.     Uber controls which trip requests it transmits to each of its drivers.

**ANSWER:** Defendants deny the allegations in Paragraph 77.

78.     Uber requires that its drivers meet or exceed the estimated time-of-arrival that Uber generates and provides to each customer.

**ANSWER:** Defendants deny the allegations in Paragraph 78.

79.     Uber limits drivers to shifts of no more than 12 hours, preventing drivers who have driven for long stints from using the app for six hours to prevent dangerous driver fatigue.[11]

**ANSWER:** Defendants admit that the Uber Driver App will prompt Drivers to go offline for at least 6 hours after a total of 12 hours of Uber Driver App online time. The remaining allegations in Paragraph 79 are denied.

80.     Uber requires that Uber drivers refrain from smoking while providing Uber services.

**ANSWER:** Defendants deny the allegations in Paragraph 80.

---

[11] Uber.com, "Another Step to Prevent Drowsy Driving," https://www.uber.com/newsroom/drowsydriving/, February 12, 2018.

81.     In addition, Uber instructs Uber drivers that the share of trip requests that they accept through Uber's app should be consistently high, and that Uber drivers may not accept street hails from potential passengers.

**ANSWER:** Defendants admit that Pennsylvania law prohibits transportation network company drivers from soliciting or accepting street hails.  Defendants deny the remaining allegations in Paragraph 81.

82.     Uber controls the safety and quality of the service the drivers provide by closely monitoring its drivers. It issues training and directives concerning other requirements to Uber drivers.

**ANSWER:** Defendants deny the allegations in Paragraph 82.

83.     Uber records many details about the demand-responsive transportation services that its drivers provide, including for each trip: (1) the pickup location, (2) the time of pickup, (3) the drop off location, (4) the time of drop off, (5) the distance traveled, (6) the trip route, (7) the trip duration, and (8) the customer's identity. Uber employees who supervise drivers have easy access to this data.

**ANSWER:** Defendants admit that the Uber Apps record certain trip information after a Driver accepts a ride request from a Rider, and that such trip information includes the pickup location and time, drop off location and time, trip distance, trip route, and trip duration.  The remaining allegations in Paragraph 83 are denied.

84.     Uber monitors its Uber drivers' performance by asking customers for written feedback, including a driver "rating" of between 1 and 5, via the app, after every ride that a driver provides, and Uber routinely follows up with customers who express dissatisfaction. Uber regularly terminates or suspends Uber drivers whose average customer rating falls below a certain threshold.

**ANSWER:** Defendants admit that the Uber Apps enable Riders and Drivers to rate each other at the end of a completed trip.  The remaining allegations in Paragraph 84 are denied.

85.     In addition, Uber maintains general commercial liability insurance to cover claims concerning incidents that occur while drivers are providing Uber transportation services.

**ANSWER:** Defendants deny the allegations in Paragraph 85.

86.     Uber tightly controls payment for its Uber transportation services.

**ANSWER:** Defendants deny the allegations in Paragraph 86.

87. Uber controls the fare charged for each trip through an algorithm which takes account of the distance traveled and duration of the trip, along with the intensity of demand for rides at the time of the ride request.

**ANSWER:** Defendants deny the allegations in Paragraph 87.

88. Uber controls the supply of drivers by encouraging them to work at particular times (by increasing fares when there is increased demand), by offering them financial rewards for accumulating a large number of trips, and by providing them with information about where they are likely to get more trips or preferential fares. Uber exerts control over how many vehicles provide its service at a given time through carefully calibrated adjustments in its service's financial incentives. For example, Uber's "surge" pricing imposes additional charges during high-demand times to "make sure those who need a ride can get one." *See* Uber Help, *What is surge?*, https://help.uber.com/h/e9375d5e-917b-4bc5-8142-23b89a440eec.

**ANSWER:** Defendants admit that Rider Prices and Driver fares can be impacted by surge

pricing.  The remaining allegations in Paragraph 88 are denied**.**

**K.    Uber Intentionally Discriminates Against People Who Need Wheelchair Accessible Ubers.**

**ANSWER:** Defendants deny the allegations in the unnumbered heading above.

89. Uber provides a valuable transportation alternative to Pittsburgh residents, allowing people to more easily travel to work, social events, community engagements, appointments, and other destinations, yet Uber excludes people with mobility disabilities from these same benefits of its convenient transportation.

**ANSWER:** Defendants deny the allegations in Paragraph 89.

90. Uber could end its discrimination against people who use wheelchair accessible vehicles if it chose to do so. In fact, it has already begun providing wheelchair accessible Ubers in several major cities. For example, in London, Uber began providing wheelchair accessible Ubers in 2016 through a service called UberACCESS.[12] It rolled out this service to six more U.K. cities the following year.[13]

**ANSWER:** Defendants deny the allegations in Paragraph 90.

---

[12] Uber.com, "Introducing uberWAV: transportation for everyone, everywhere in London," https://newsroom.uber.com/uk/ldnwav/, May 10, 2016.
[13] Uber.com, "Forward-facing, forward thinking: introducing uberACCESS," https://www.uber.com/en-GB/blog/uber-access-2/, March 23, 2017;TheNextWeb.com, "Uber's wheelchair-accessible uberACCESS service launches in four new UK markets," https://thenextweb.com/insider/2017/07/14/ubers-wheelchair-accessible-uberaccess-service-launches-four-new-uk-markets/, July 14, 2017.

91.     Closer to home, Uber has made UberWAVs available in Philadelphia, rolling out a fleet of wheelchair accessible vehicles in June of 2017.[14]

**ANSWER:** Defendants deny the allegations in Paragraph 91.

92.     However, Uber has taken no steps to provide wheelchair accessible Ubers in a way which would make Uber's transportation service fully and equally accessible in Pittsburgh.

**ANSWER:** Defendants admit that they do not provide vehicles.  Defendants deny the remaining allegations in Paragraph 92.

93.     Plaintiffs seek no monetary relief (apart from attorneys' fees and costs) in this action.

**ANSWER:** Defendants admit that neither Title III of the ADA nor the Declaratory Judgment Act permits a plaintiff to recover damages.  Defendants deny the remaining allegations in Paragraph 93.

94.     Plaintiffs do not here specifically seek an order requiring Uber to purchase vehicles as a way of putting an end to its discriminatory conduct. Given Uber's extensive control over the operation of the drivers, including through its fare structure, there are many ways Uber can provide relief.

**ANSWER:** Defendants deny the allegations in Paragraph 94.

95.     Plaintiffs contacted Uber requesting that it reasonably modify its policies and practices to ensure that persons needing wheelchair accessible vehicles have full and equal access to Uber's on-demand transportation service in Allegheny County. Uber has failed to make those modifications and continues to provide no wheelchair accessible vehicles as a part of its on-demand transportation services.

**ANSWER:** Defendants deny the allegations in Paragraph 95.

### FIRST CAUSE OF ACTION
<u>Discrimination Prohibited by the Americans With Disabilities Act</u>
<u>(42 U.S.C. §§ 12181, *et seq.*)</u>

96.     Plaintiffs incorporate by reference as though fully set forth herein the preceding and subsequent paragraphs of this Complaint.

---

[14] Philly.com, "Uber and Lyft's wheelchair access grows, with room to improve," http://www.philly.com/philly/business/transportation/ubers-wheelchair-accessibility-grows-with-room-for-improvement-20170706.html, July 6, 2017.

**ANSWER:**   Defendants incorporate their responses to the preceding and subsequent paragraphs of the First Amended Complaint as if fully set forth herein.

97.     Title III of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of specified public transportation services provided by private entities primarily engaged in the business of transporting people and whose operations affect commerce. 42 U.S.C. § 12184.

**ANSWER:** The allegations in Paragraph 97 purport to summarize legal obligations under Title III of the ADA.  To the extent a response is required, Defendants deny the allegations in Paragraph 97.

98.     Public transportation is defined to mean "transportation by bus, rail, or any other conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10).

**ANSWER:** The allegations in Paragraph 98 purport to quote a federal statute.  To the extent a response is required, Defendants deny the allegations in Paragraph 98.

99.     Defendants provide specified public transportation services within the meaning of the term under Title III on a regular and continuing basis.

**ANSWER:** Defendants deny the allegations in Paragraph 99.

100. Title III of the ADA also prohibits discrimination on the basis of disability in the full and equal enjoyment of services provided by places of public accommodations. 42 U.S.C. § 12182.

**ANSWER:** The allegations in Paragraph 100 purport to summarize legal obligations under Title III of the ADA.  To the extent a response is required, Defendants deny the allegations in Paragraph 100.

101. Defendants operate a public accommodation subject to Title III's nondiscrimination requirements. 42 U.S.C. §§ 12181, 12182.

**ANSWER:** Defendants deny the allegations in Paragraph 101.

102. Defendants operate a "travel service" as defined by 42 U.S.C. § 12181.

**ANSWER:** Defendants deny the allegations in Paragraph 102.

103. Defendants' operations affect interstate commerce, including by providing transportation across state lines.

**ANSWER:** Defendants deny the allegations in Paragraph 103.

104. Defendants discriminate against Plaintiffs and members of the putative class by denying them full and equal enjoyment of Uber's goods, services, facilities, privileges, advantages, and/or accommodations in violation of Title III of the ADA. Defendants have failed to make reasonable modifications to their policies, practices, or procedures, provide auxiliary aids and services, and remove barriers in order to afford full and equal access to their service to Plaintiffs and members of the putative class.

**ANSWER:** Defendants deny the allegations in Paragraph 104.

## SECOND CAUSE OF ACTION
### Declaratory Relief on Behalf of Plaintiffs

105. Plaintiffs incorporate by reference all foregoing and subsequent allegations as though fully set forth herein.

**ANSWER:**   Defendants incorporate their responses to the foregoing and subsequent

paragraphs of the First Amended Complaint as if fully set forth herein.

106. An actual controversy exists between the parties. Plaintiffs contend, and are informed and believe that Defendants deny, that by failing to adopt policies and practices that make WAVs available through its service, Defendants are failing to comply with applicable laws, including but not limited to Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.*

**ANSWER:** Defendants deny the allegations in Paragraph 106.

107. A judicial declaration is necessary and appropriate at this time in order that the parties may know their respective rights and duties and act accordingly.

**ANSWER:** Defendants deny the allegations in Paragraph 107.

WHEREFORE, Plaintiffs pray for the relief set forth below.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs respectfully pray for relief as follows:

a.      For an order certifying this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2), and appointing Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

b.      For an order finding and declaring that the acts and practices of Uber as set forth herein are unlawful, unfair, and violate the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.*;

c.      For a permanent injunction pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.*, to ensure that individuals who use wheelchairs, including Plaintiffs, are able to use Uber's service on a basis that is full and equal to that which is available to other members of the general public;

d.      For an award of attorneys' fees, costs and expenses incurred in the filing and prosecution of this action, as authorized by 42 U.S.C. §12188; and

e.      For such other and further relief as the Court deems just and proper.

**ANSWER:** The text following the "Prayer for Relief" heading in the First Amended Complaint, including Paragraphs "a" through "e," are requests for relief to which no response is required.  To the extent any response is required, Defendants deny that Plaintiffs are entitled to any relief whatsoever.

## GENERAL DENIAL

Defendants generally deny any allegation not specifically admitted, including any allegations contained in unnumbered paragraphs, headings, subheadings, footnotes, figures, exhibits, or prayer for relief.  Any response to any allegation should not be construed as a concession that an allegation is factual in nature instead of a legal conclusion, or vice-versa. Defendants deny that Plaintiffs can meet their burden of proof to establish each and every element of their claims, and further deny that Plaintiffs can establish they are entitled to any of the relief they demand.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following affirmative and other defenses.  To the extent any of the defenses, in whole or in part, serves to negate only an element of Plaintiffs' causes of action,

Defendants do not seek to relieve Plaintiffs of their burden of proof or persuasion on that element, nor do Defendants assume the burden of proof of any other burden, if such burden would otherwise be Plaintiffs' burden.  Defendants reserve all rights to amend or modify these defenses consistent with the Federal Rules of Civil Procedure.

1.      The relief Plaintiffs seek would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations Defendants offer to the public and would fundamentally alter Defendants' business model.

2.      The relief Plaintiffs seek would result in an undue burden on Defendants.

3.      Plaintiffs are bound to arbitrate their dispute with Defendants.

4.      The Court lacks subject-matter jurisdiction because Plaintiffs lack standing.

5.      Plaintiffs lack a private right of action under Title III of the ADA.

6.      Plaintiff PPT lacks associational standing.

7.      Defendants do not own, lease, lease to, or operate any "place of public accommodation." within the meaning of Title III of the ADA.

8.      Defendants do not operate a "travel service" within the meaning of Title III of the ADA.

9.      No Defendant is a "private entity primarily engaged in the business of transporting people" within the meaning of Title III of the ADA

10.     Defendants do not provide "specified public transportation" within the meaning of Title III of the ADA.

11.     Any discrimination alleged does not relate to transportation "provided by" any Defendant.

12.     Plaintiffs have not requested that Defendants make reasonable modifications to any

policies, practices, or procedures that are necessary to afford the goods, services, facilities, privileges, advantages, or accommodations Defendants offer to the public to individuals with disabilities.

13.     Defendants have not discriminated against Plaintiffs or any person Plaintiffs purport to represent on the basis of disability.

14.     Plaintiff cannot demonstrate that Defendants have violated any obligation imposed by Title III of the ADA or applicable regulations.

15.     Title III of the ADA does not require Defendants to provide, guarantee, facilitate, or encourage the provision or availability of transportation in wheelchair-accessible vehicles.

16.     Title III of the ADA does not require Defendants to provide or guarantee service that meets the standard set forth in 49 C.F.R. § 37.105.

17.     To the extent not already included in the foregoing defenses, Plaintiffs have failed to state a claim upon which relief can be granted for the reasons asserted in Defendants' Motion to dismiss Plaintiff's First Amended Complaint and Defendants' briefing in support of that motion.

18.     Plaintiffs cannot demonstrate any entitlement to injunctive relief because Plaintiffs cannot demonstrate an imminent risk of irreparable harm to Plaintiffs or any person Plaintiffs purports to represent.

19.     Plaintiffs cannot demonstrate any entitlement to injunctive relief because Plaintiffs cannot demonstrate that the balance of equities weighs in favor of injunctive relief.

20.     Plaintiffs cannot demonstrate any entitlement to injunctive relief as Plaintiffs have not and cannot craft an injunction that complies with the requirements of Federal Rule of Civil Procedure 65 and otherwise comports with due process.

21.     Plaintiffs cannot demonstrate that they are entitled to an award of attorneys' fees or

costs.

22.    Plaintiffs cannot demonstrate they are entitled to declaratory relief.

MORGAN, LEWIS & BOCKIUS LLP

Dated: June 28, 2021

By: *s/ Stephanie Schuster*

Anne Marie Estevez (*pro hac vice*)
200 Biscayne Boulevard, Suite 5300
Miami, FL 33131
T:  305.415.3000
F:  305.415.3001
annemarie.estevez@morganlewis.com

Stephanie Schuster (*pro hac vice*)
Patrick A. Harvey (*pro hac vice*)
1111 Pennsylvania Avenue, NW
Washington, DC  20004
T:  202.739.3000
F:  202.739.3001
stephanie.schuster@morganlewis.com
patrick.harvey@morganlewis.com

Christopher K. Ramsey (PA ID #63293)
32nd Floor, One Oxford Centre
Pittsburgh, PA  15219
T:  412.560.3323
F:  412.560.7001
christopher.ramsey@morganlewis.com

*Counsel for Defendants*